# UNITED STATES DISTRICT COURT

### for the
### Middle District of Florida

| | |
|---|---|
| HARVEST MOON DISTRIBUTORS, LLC | ) |
| *Plaintiff* | ) |
|  | ) |
|  | ) Civil Action No. 6:20-cv-01026-PGB-DCI |
| v. | ) |
|  | ) |
|  | ) |
| SOUTHERN-OWNERS INSURANCE COMPANY | ) |
| *Defendant* | ) |
|  | ) |

---

**DISPOSITIVE MOTION**

**DEFENDANT SOUTHERN-OWNERS INSURANCE COMPANY'S
MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

---

Lori McAllister, Esq.
MI Bar No.: 39501
*pro hac vice* application forthcoming
Dykema Gossett PLLC
Capitol View, 201 Townsend Street
Suite 900
Lansing, MI 48933
Tel.: (517) 374-9100
E-mail: lmcallister@dykema.com

COLE, SCOTT & KISSANE, P.A.
4301 West Boy Scout Boulevard
Suite 400
Tampa, FL 33607
Tel.: (813) 509-2613
Fax: (813) 286-2900
Primary e-mail: mark.tinker@csklegal.com
Secondary: mason.bradford@csklegal.com

By: _____
Mark D. Tinker, Esq., B.C.S.
Florida Bar No.: 0585165

*Trial Counsel for Southern-Owners Ins. Co.*

## MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Middle District of Florida Rule 3.01, Defendant Southern-Owners Insurance Company ("SOIC") requests that this Court dismiss Harvest Moon Distributors LLC's ("Harvest Moon" or "Plaintiff") Complaint for failure to state a claim upon which relief can be granted.

## Concise Statement of the Precise Relief Requested

Plaintiff seeks "compensatory damages, interest, costs, and attorney's fees pursuant to F.S. § 627.428, F.S. § 626.9373, F.S. § 57.041, and F.S. § 92.231," along with a judicial declaration that Plaintiff is entitled to Business Income, Extra Expense, Accounts Receivable, and Inventory coverage under a Commercial Property insurance policy issued by SOIC. (Doc. 1-2 at ¶¶ 28, 45.) The existence or nonexistence of insurance coverage presents a pure question of law, and as a matter of law, Plaintiff has not alleged any facts that give rise to coverage.

Plaintiff asserts that it "operates as a wine and beer distributor." (Doc. 1-2 at ¶ 34.) It purchases beer from its suppliers, then sells that beer "to certain Vendors, including Walt Disney Parks and Resorts US Inc." (*Id.*) With respect to the claim at issue, Plaintiff "purchased certain South African Beers" from a supplier with plans to distribute that beer "specifically in accordance with its contract with Walt Disney Parks." (*Id.* ¶ 39.) Before Plaintiff could distribute that beer, however, Disney implemented a "voluntary closure" of its facilities in light of the COVID-19 pandemic. (*Id.* ¶¶ 39, 40.) Apparently, Disney did not pay Plaintiff for the beer that had been purchased "in accordance with its contract" and, by the time Disney decided it would re-open, the beer had spoiled. (*Id.* ¶ 42.)

Rather than confront its client and seek damages *from Disney*, *for Disney's* apparent refusal to accept or pay for beer that had been purchased "in accordance with its contract," Plaintiff filed this lawsuit against Southern-Owners Insurance Company ("SOIC"), attempting to turn a run-of-

the-mill breach of contract action between a buyer and seller into a property insurance claim.  That attempt should be rejected for the simple reason that the Policy's plain terms do not cover damages caused by a buyer's refusal or inability to accept undamaged goods.  *See, e.g.*, *Zodiac Grp., Inc. v. Axis Surplus Ins. Co.*, 542 F. App'x 844, 848 (11th Cir. 2013) (affirming dismissal on the pleadings because "the plain language of the Policy precluded coverage").

The Policy makes clear that, for coverage to apply, the insured must have suffered "direct physical loss or damage" to Covered Property.  And while direct physical loss or damage to Covered Property is necessary to invoke coverage, even it standing alone is not sufficient.  For an insured who experiences a "direct physical loss of or damage to Covered Property," coverage will only apply (1) if that direct physical loss of or damage to Covered Property was "caused by or resulting from" a "Covered Cause of Loss"—defined to mean any "Risks of Direct Physical Loss"—and (2) if no Exclusions in the Policy prohibit coverage.

Plaintiff fails at each step.  As to coverage, Plaintiff appears to claim two forms of damage—loss of the beer itself, and loss of income.  It cannot show coverage for either.  The beer could arguably qualify as Covered Property under the Policy's definition of "Stock,"  but damage to Covered Property is only recoverable if that damage was caused by a Covered Cause of Loss.  Here, it was not.  Instead, as Plaintiff admits, it was caused by Disney's "voluntary closure" and refusal or inability to accept entirely undamaged goods.

As to the loss of income, that is only recoverable under this property insurance policy if the loss is caused by a "necessary suspension" of Plaintiff's "operations"—meaning all business activities occurring at the insured premises.  Here, Plaintiff alleges no such suspension.  Instead, Plaintiff has admitted elsewhere that it continued to operate when it had willing buyers.  Moreover, even if all of that were not true—and Plaintiff met its burden of showing that it was entitled to

3

coverage for loss of the beer or loss of income—coverage was still properly denied because the Policy directly excludes coverage under these circumstances.  For these reasons, and those explained below, Plaintiff's Complaint should be dismissed.  And because the failures are not amenable to amendment, that dismissal should be with prejudice.

**Statement of the Basis for the Request**

**I.      Legal Framework**

Under the *Erie* doctrine, "the construction of insurance contracts is governed by substantive state law."  *Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 412 F.3d 1224, 1227 (11th Cir. 2005) (citation omitted).  Florida applies the traditional rule of *lex loci contractus* to insurance contracts, such that "the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage."  *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So.2d 1160, 1163 (Fla. 2006) (citing *Stuiriano v. Brooks*, 523 So.2d 1126, 1129 (Fla. 1988)); *see also LaTorre v. Conn. Mut. Life Ins. Co.*, 38 F.3d 538, 540 (11th Cir. 1984) ("Florida adheres to the traditional rule that the legal effects of terms of the insurance policy and rights and obligations of persons insured thereunder are to be determined by the law of the state where the policy was issued.").

The subject insurance policy was issued to Plaintiff in Florida, and it covers the described premises located at 3451 Parkway Center Ct., Orlando Florida 32808-1047.  (Doc. 1-6 at PageID 53.)  Florida law therefore controls the Policy's interpretation.

"Under Florida law, the interpretation of an insurance contract is a matter of law to be decided by the court."  *AIX Specialty Ins. Co. v. Ashland 2 Partners, LLC*, 383 F. Supp. 3d 1334, 1337 (M.D. Fla. 2019).  "When considering insurance coverage disputes, courts routinely dismiss complaints for failure to state a claim when a review of the insurance policy and the underlying

4

claim for which coverage is sought unambiguously reveals that the underlying claim is not covered." *Cammarota v. Penn-America Ins. Co.*, No. 17-cv-21605, 2017 U.S. Dist. LEXIS 188073, at *5-6 (S.D. Fla. Nov. 9, 2017) (collecting cases within and outside the Eleventh Circuit and Florida).

This Court may consider the terms of the Policy at this stage even though Plaintiff failed to attach the Policy to its Complaint, because the Policy is referenced in and central to Plaintiff's claims. *See Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1318 n.3 (11th Cir. 2018) (courts may consider documents "beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss" if "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss").

SOIC has attached the Policy in its entirety to its Notice of Removal (Doc. 1-6 at PageID 46), and the relevant coverage forms are attached to this Motion as **Exhibit 1.**  To the extent any of the Complaint's allegations conflict with the Policy's terms, the Policy controls.  *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls."); *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.").

## II.   <u>Plaintiff's Allegations</u>

In this case, Plaintiff's Complaint alleges the following: Plaintiff "operates as a wine and beer distributor, supplying its products to certain Vendors, including Walt Disney Parks and Resorts US Inc."  (Doc. 1-2 at PageID 18, ¶ 34.)  At an unidentified date, Plaintiff "purchased

South African Beers specifically in accordance with its contract with" Disney, planning to sell its product to Disney for a profit.  (Doc. 1-2 at PageID 20, ¶ 39.)

On March 15, 2020, before Plaintiff could ship its product, Disney voluntarily "close[d] its doors to the public in an effort to help 'stop the spread' amidst concerns of the growing COVID-19 pandemic." (Doc. 1-2 at PageID 18, ¶ 33.)  Plaintiff appears to allege that, once Disney shut its doors, Disney refused to accept Plaintiff's product, or to compensate Plaintiff for any non-delivered product in accordance with the terms of its "contract."  (Doc. 1-2 at PageID 20, ¶¶ 39, 40.)  Plaintiff does not allege that Disney refused to accept the beer because that beer was contaminated by COVID-19, or that the COVID-19 pandemic affected the quality of the beer at all.  Instead, Plaintiff admits that any damages sustained were sustained because Disney voluntarily chose to close its parks and not buy the beer Plaintiff was intending to sell it.  (Doc. 1-2 at PageID 20, ¶ 40 ("Due to Walt Disney Parks & Resorts US Inc.'s voluntary closure . . . Harvest Moo[n] Distributors LLC lost Business Income, Extra Expense, Inventory, and Accounts Receivable").)  Plaintiff further alleges that its "loss of use of the insured property and insured property's inability to function as contemplated and intended by Plaintiff and Defendant is a direct physical loss." (Doc. 1-2 at PageID 15, ¶ 15.)  At the same time, Plaintiff admits that it is "unsure of Plaintiff's right to coverage for direct physical loss . . ."  (Doc. 1-2 at PageID 17, ¶ 31.)

A mere four days after Disney closed its doors (and presumably before the beer had spoiled), Plaintiff "submitted its claim to Defendant for Loss of Business Income, Extra Expense, Inventory, and Accounts Receivable due to the COVID-19 pandemic." (Doc. 1-2 at PageID 20, ¶ 41.)  Eventually, with Disney's doors still closed, the beer went bad,[1] so "[o]n or about April 15,

---

[1] Because it is not relevant to the coverage issue, at this pleadings stage SOIC accepts as true the allegation that the beer went "bad" within a month.  But when ruling on a motion to dismiss, a district court may consider extrinsic evidence if its authenticity is not challenged or if it is a matter

6

2020," Plaintiff "submitted its sworn proof of loss for loss of business income due to spoilage of its product, loss of inventory, and loss of profit."  (Doc. 1-2 at PageID 20, ¶ 42.)   After SOIC "denied Plaintiff's claim," Plaintiff filed this lawsuit, seeking damages for breach of contract, in addition to a declaratory judgment.  (Doc. 1-2.)

## III.   <u>The Insurance Policy.</u>

Plaintiff seeks Business Income, Extra Expense, Inventory, and Accounts Receivable coverage under the Policy's Business and Personal Property Coverage Form.  (Doc. 1-2 at PageID 14-17, ¶¶ 9, 15, 21, 31.)  And, giving a generous reading to Plaintiff's Complaint, it could also be read to seek loss of "Stock" through the spoiled beer.  (Doc. 1-2 at PageID 18, ¶ 36.)

### A.   **All Coverage That Plaintiff Points To Under the Policy Requires the Insured to Have Suffered "Direct Physical Loss of or Damage to Covered Property . . . Resulting From Any Covered Cause of Loss."**

Under the Policy's Building and Personal Property Coverage Form CP 00 10 (10-91)—which Plaintiff invokes in its Complaint—coverage is triggered by a "direct physical loss of or damage to Covered Property."  (Doc. 1-2 at PageID 20 ¶ 36.)  The "Coverage" provision states:

### A.  COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

(Doc. 1-6 at PageID 165.)  The Business and Personal Property Coverage Form incorporates a "Causes of Loss Form as shown in the Declarations" to define "Covered Causes of Loss," and it incorporates that same Causes of Loss Form to define the Policy's Exclusions.  (*Id.* at PageID 167,

---

of public record. *Myers v. Foremost Ins. Co.*, 82015 WL 12830477, at *3 (M.D. Fla. Oct. 23, 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)). According to studies compiled by the United States Department of Agriculture and the United States Food & Drug Administration, the *minimum* shelf life for beer—even if homemade and unrefrigerated—is 6–9 months. https://www.eatbydate.com/drinks/alcohol/beer-shelf-life/

169.)  The Causes of Loss – Special Form 54082 (2-05) defines a "Covered Cause of Loss" as "RISKS OF DIRECT PHYSICAL LOSS unless the loss is: 1. Excluded in Section B., Exclusions; or 2. Limited in Section C., Limitations."  (*Id.* at PageID 82.)  In other words, Coverage only exists if (1) Plaintiff suffered a "direct physical loss of or damage to Covered Property" at the insured premises; (2) arising from a Covered Cause of Loss; (3) when that direct physical loss of or damage to Covered Property is not otherwise excluded.

The Policy also includes endorsements for Business Income, Extra Expense, Accounts Receivable, and Inventory.  These endorsements are added to the Business and Personal Property Coverage Form's "Additional Coverages" section, meaning that they are also subject to the general requirement holding SOIC responsible only "for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  The Endorsements provide, in relevant part:

> The following coverages are added to A. COVERAGE, 4. Additional Coverages:
>
> **a. Business Income**
>
> Subject to the Limit of Insurance provisions of this endorsement, we will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations"[2] during the "period of restoration."[3]
>
> Business Income means the: (1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and (2) Continuing normal operating expenses incurred, including payroll.

---

[2] The Business Income and Extra Expense Endorsement defines "Operations" as "your business activities occurring at the described premises or at a newly acquired location." (Doc. 1-6 at PageID 97.)

[3] The Business Income and Extra Expense Endorsement defines the "period of restoration" as "the period of time that: a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises or at a "newly acquired location"; and b. Ends on the date when the property at the described premises or at a "newly acquired location" should be repaired, rebuilt or replaced with reasonable speed and similar quality."  (Doc. 1-6 at PageID 97.)

**d. Extra Expense**

Subject to the Limit of Insurance provisions of this endorsement, we will pay necessary Extra Expense you incur during the "period of restoration".

Extra Expense means expense incurred: (1) To avoid or minimize the suspension of business and to continue "operations" . . . (2) To minimize the suspension of business if you cannot continue "operations" [and] (3)(a) To repair or replace any property; or (b) To research, replace or restore the lost information on damaged valuable papers and records . . . .

(Doc. 1-6 at PageID 94.)

The Accounts Receivable Endorsement provides:

Under A. Coverage, 4. Additional Coverages, the following Additional Coverage is added:

**Accounts Receivable**

We will pay: 1. all amounts your customers owe you that you cannot collect; 2. interest charges on loans you secure to offset impaired receipts until we pay these amounts; 3. collection costs in excess of normal; and 4. other expenses you reasonably incur to re-establish your records; ***which result from direct physical loss of or damage to your records of accounts receivable***; 1. caused by or resulting from any Covered Cause of Loss; and 2. which occurs on the premises described in the Declarations. . . .

(Doc. 1-6 at PageID 114 (emphasis added).)

And finally, the Inventory Endorsement provides:

Under **A. COVERAGE, 4. Additional Coverages,** the following Additional Coverage is added:

**Inventory**

**a.**   The limit of Insurance for Business Personal Property (BPP) will automatically increase by the Limit of Insurance shown in the Declarations for INVENTORY for temporary variations in inventory.

**b.**   This increase will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 80% of your average monthly values during the lesser of:

9

**(1)** The twelve months immediately preceding the date the loss or damage occurs; or

**(2)** The period of time you have been in business as of the date the loss or damage occurs.

No Deductible applies to this Additional Coverage.  All other policy terms and conditions apply.

(Doc. 1-6 at PageID 68.)

     **B.**    **The Policy Provides for "Spoilage" Coverage In Limited Circumstances That Are Not Applicable Here.**

In addition, the Policy expressly provides for "Spoilage Coverage" in two limited circumstances.  Under the Equipment Breakdown Endorsement's "Spoilage Coverage," SOIC is responsible "for loss of perishable goods due to spoilage resulting from lack of power, light, heat, steam or refrigeration caused by an 'Equipment Breakdown' to types of property covered by this policy . . ."  (Doc. 1-6 at PageID 149-150.)  And under the "Motor Cargo Special Form," SOIC "cover[s] direct physical loss resulting from 'spoilage' to 'perishable stock' while in due course of transit on or in a 'vehicle' when the refrigeration or heating unit of a 'vehicle' transporting covered property has a sudden or accidental breakdown or malfunction." (Doc. 1-6 at PageID 224.)  There is no Spoilage Coverage under the Business Income or Extra Expense Endorsements, or under the Policy's general grant of coverage.

     **C.**    **The Policy's Relevant Exclusions.**

Even if the insured suffers a "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss," coverage will be barred if one of the Policy's Exclusions apply.  As mentioned above, the Business and Personal Property Form incorporates the Causes of Loss Form's "Exclusions."  (Doc. 1-6 at

PageID 169.)   As relevant to this case, the Causes of Loss Form carves out the following

Exclusions:

### B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of
the following.  Such loss or damage is excluded regardless of any other cause
or event that contributes concurrently or in any sequence to the loss.

   a. Ordinance or Law

   The enforcement of any ordinance or law: (1) Regulating the
   construction, use or repair of any property; or (2) Requiring the tearing
   down of any property, including the cost of removing its debris.

. . . .

2. We will not pay for loss or damage caused by or resulting from any of the
following: . . .

   b. Delay, loss of use or loss of market. . . .

   d. . . . (2) Rust, corrosion, decay, deterioration, hidden or latent defect or
   any quality in property that causes it to damage or destroy itself; . . . .

3. We will not pay for loss or damage caused by or resulting from any of the
following.  But if loss or damage by a Covered Cause of Loss results, we
will pay for the resulting loss or damage. . . .

   b. Acts or decisions, including the failure to act or decide, of any person,
   group, organization or governmental body. . . .

4. Special Exclusions. The following provisions apply only to the specified
Coverage Forms.

   a. Business Income (And Extra Expense) Coverage Form . . . We will
   not pay for:

      (1) Any loss caused by or resulting from: (a) Damage or destruction
      of "finished stock;" or (b) The time required to reproduce "finished
      stock." . . .

      (3) Any increase of loss caused by or resulting from: . . . (b)
      Suspension, lapse or cancellation of any license, lease or contract.
      But if the suspension, lapse or cancellation is directly caused by the

suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

(4) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration."

(5) Any other consequential loss.

(Doc. 1-6 at PageID 82-85.)

Because Plaintiff's claim does not fit within the Policy's coverage, SOIC moves to dismiss. Likewise, because the deficiencies cannot be cured by amendment, that dismissal should be with prejudice.

## **Memorandum of Legal Authority**

"Florida law places on the insured the burden of proving that a claim against it is covered by the insurance policy." *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997); *see also Diamond State Ins. Co. v. Boys' Home Ass'n, Inc.*, 172 F. Supp. 3d 1326, 1334 (M.D. Fla. 2016) ("[T]he insured bears the burden of proving that a claim is covered by the insurance policy[.]").  It necessary follows that, to state a valid cause of action, Plaintiff's Complaint must allege ultimate facts that bring the claim within the Policy's insurance agreement. *LaFarge Corp.*, 118 F.3d at 1516.

If Plaintiff meets that initial burden, then the burden shifts to SOIC to prove that an exclusion applies.  *Mid-Continent Cas. Co. v. Frank Casserino Constr.*, 721 F. Supp. 2d 1209, 1215 (M.D. Fla. 2010) ("Once the insured shows coverage, the insurer has the burden of proving an exclusion.").  Here, Plaintiff fails at each step.  Plaintiff cannot meet its initial burden of proving that its claim is covered by the Policy and, even if it could, the Policy's exclusions would still bar coverage.  Plaintiff's Complaint should therefore be dismissed with prejudice.

I.     **Plaintiff is Not Entitled to Coverage for the Loss of Beer Under the Business Income, Extra Expense, Accounts Receivable, or Inventory Endorsements Because Any Damage to the Beer Did Not Result from a Covered Cause of Loss.**

As mentioned above, the first form of damage Plaintiff appears to claim is for the loss of beer itself, alleging that the beer qualifies as Covered Property because it is "Stock." (Compl. ¶ 36.) Each form of Coverage that Plaintiff points to under the Policy—Business Income, Extra Expense, Accounts Receivable, and Inventory—require that damage to Covered Property is only covered if there was ""direct physical loss or damage" to that Covered Property, and that the direct physical loss or damage to Covered Property was "caused by or resulting from" any "Risks of Direct Physical Loss." (BPP Coverage Form, ECF No. 1-6, PageID 165, 167.)

A.     **Direct Physical Loss Under Florida Law Requires Actual Damage to Property.**

Florida courts have found that a "direct physical loss 'contemplates an actual damage in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.'" *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362-KMM, 2018 U.S. Dist. LEXIS 201852, at *24 (S.D. Fla. June 11, 2018) (citation omitted); *Homeowners Choice Prop. & Cas. v. Maspons*, 211 So. 3d 1067, 1069 (Fla. 3d DCA 2017) ("A 'loss' is the diminution of value of something . . . 'Direct' and 'physical' modify loss and impose the requirement that the damage be actual.").

This is consistent with how courts across the country interpret the "direct physical loss" requirement. *See, e.g.*, *Universal Image Prod., Inc. v. Federal Ins. Co.*, 475 F. App'x 569, 573 (6th Cir. 2012) (applying Michigan law and construing "direct physical loss or damage" as requiring "tangible damage" to the policyholder's property, equating to "physical loss."); *Port Auth. of New York & New Jersey v. Affiliated FMIns. Co.*, 311 F.3d 226, 235 (3d. Cir. 2002) ("In

ordinary parlance and widely accepted definition, physical damage to property means a distinct, demonstrable, and physical alteration of its structure."); *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 115 Cal. Rptr. 3d 27, 37-38 (Cal. Ct. App. 2010) ("A direct physical loss contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.").  And it is consistent with a leading treatise in the industry.  *See* 10A Steven Plitt, *et al*., COUCH ON INSURANCE § 148:46 (3d ed. 2019) ("The requirement that the loss be 'physical,' given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.")

### B.   The Spoilage of Plaintiff's Beer Was Not "Caused By or Resulting From" a "Risk of Direct Physical Loss."

Here, the only possible "direct physical loss or damage" alleged in Plaintiff's Complaint is the spoilage of Plaintiff's beer.  (Doc. 1-2 at ¶ 42 ("Plaintiff submitted its sworn proof of loss for loss of business income due to spoilage of its product . . .").)  But that is only the first step.  For coverage to apply, the "direct physical loss" must have been caused by or resulted "from any Covered Cause of Loss."  (Doc. 1-6 at PageID 165, 167.)  That causation requirement is important. Without it, Plaintiff could seek coverage for all damage to its property no matter how that damage occurred.  For instance, Plaintiff could purchase millions of bottles of beer—no matter how many it could realistically sell—and, pass along the costs of any unsold bottles to the insurer as soon as the beer went bad.

Dispositive here, Plaintiff makes no allegation that the "damage" that occurred to its beer resulted from a Covered Cause of Loss.  Quite the contrary, in several instances, Plaintiff's factual

allegations make clear that any damage to its beer was *not* caused by a Covered Cause of Loss. Plaintiff expressly and affirmatively states that it "lost Business Income, Extra Expense, Inventory, and Accounts Receivable" "*due to Walt Disney Parks & Resorts US Inc.'s voluntary closure*." (Doc. 1-2 at PageID 20, ¶ 40 (emphasis added).)  And it further alleges that its "direct physical loss" was the "loss of use of the insured property and insured property's inability to function as contemplated and intended."  (*Id.* at PageID 15, ¶ 15.)  In short, Plaintiff appears to contend that the damage was caused by a buyer's refusal to purchase its product—not by an insured risk of "direct physical loss."  Under similar circumstances, where the causation element is missing, courts have rejected attempts to claim coverage.

Take, for example, the case of *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 108 F. Supp. 3d 543 (E.D. Mich. 2015).  There, the plaintiff had "business income" coverage requiring the insurer to pay for "the actual loss of Business Income . . . you sustain due to the necessary suspension of your operations during the period of restoration.  The suspension must be caused by direct physical loss to property at a premises caused by or resulting from any Covered Cause of Loss."  *Id.* at 551. After a flood damaged the plaintiff's bowling alley, the plaintiff filed a claim for "business personal property that allegedly was lost due to the water event."  *Id.* at 563.  Among this property was "spoiled liquor and beer" that "'went bad' after being unused for too long" while the bowling alley was being repaired.  *Id.*  The plaintiff argued that "the liquor and beer became a 'direct physical loss' when it 'went bad' during the extended shutdown of the bowling alley after the water event."  *See id.*  The court disagreed, because "none of the liquor and beer that 'went bad' was damaged by water."  *Id.*  The policy "only cover[ed] against 'direct physical loss *due to an insured risk*, and the property here was not damaged by the water event.  The claim for loss of beer

and liquor is, essentially, a portion of consequential damages . . . rather than a direct claim for loss due [to] a covered risk." *Id.* (emphasis added)

Likewise, in *Borton & Sons, Inc. v. Travelers Ins. Co.*, No. 18100-6-III, 2000 WL 60028 (Wash. Ct. App. Jan. 25, 2000), the plaintiff—who "grows, stores, and packs apples in domestic and foreign markets"—had coverage "for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss." *Id.* at *2, 10.   The roof over one of the plaintiff's apple storage facilities collapsed, contaminating the apples.   Somewhat relatedly, the plaintiff alleged that it had been unable to sell 1,089 boxes of uncontaminated apples that were stored in a separate building because the "inferior" apples in the damaged building "eroded confidence in the plaintiff's apples" and lessened demand.   *Id.* at *3.   The court recognized that these apples "were not damaged physically by the roof collapse," and because these "apples sustained no physical damage resulting from the roof collapse," *the plaintiff's "inability to sell the apples was not a 'direct physical loss' covered under the deluxe property coverage form*."   *Id.* at *10, 13 (emphasis added).

And again, in *Source Food Technology, Inc. v. U.S. Fidelity & Guarantee Co.*, 465 F.3d 834 (8th Cir. 2006), the plaintiff was unable to sell its beef due to an embargo related to the mad cow disease.   *Id.* at 835.   The plaintiff sought coverage under a policy requiring that the business interruption "suspension must be caused by direct physical loss to Property." *Id.*   And the Eighth Circuit found that the insurer's denial of coverage was appropriate:

> Although Source Food's beef product in the truck could not be transported to the United States due to the closing of the border to Canadian beef products, the beef product on the truck was not—as Source Foods concedes— physically contaminated or damaged in any manner. To characterize Source Food's inability to transport its truckload of beef product across the border and sell the beef product in the United States as direct physical loss to property would render the word "physical" meaningless.

16

*Id.* at 838.

The same analysis applies here.  The Policy requires that Plaintiff's "direct physical loss" (the spoilage of the beer) must have been "caused by or resulting from" a "risk[] of direct physical loss."  Nothing of the sort occurred here.  Just as the spoiled alcohol in *Bowlers' Alley* was not caused by the Covered Cause of Loss (a flood), and the spoiled apples in *Borton* were not caused by the Covered Cause of Loss (the roof collapse), the spoiled beer in this case was not caused by any Covered Cause of Loss (which Plaintiff does not identify) under the Policy.[4]

Instead, as Plaintiff admits, the spoilage in beer was due to it not having its primary or target customer.  The reason beyond that is irrelevant.  Whether it was due to a competitor offering better pricing, Disney changing restaurant themes such that South African beer was no longer relevant, or "[d]ue to Walt Disney Parks & Resorts US Inc.'s voluntary closure, in an effort to minimize risk and help 'stop the spread' of the COVID-19 pandemic," the fact remains that Plaintiff was nothing more than a business unable to sell its desired amount of product.  (Doc. 1-2 at PageID 20, ¶ 40.)

Regardless of the reason for Harvest Moon's inability to sell its product, it cannot meet its burden of proving direct physical loss or damage caused by a Covered Cause of Loss, and this Court need go no further.  Plaintiff's Complaint should be dismissed with prejudice.

---

[4] Indeed, the Policy carves out two discrete instances when spoilage of goods is caused by a Covered Cause of Loss and therefore recoverable: (1) when "spoilage" is "resulting from lack of power, light, heat, steam or refrigeration caused by an 'Equipment Breakdown' to types of property covered by this policy . . ."; and (2) when there is "direct physical loss resulting from 'spoilage' to 'perishable stock' while in due course of transit on or in a 'vehicle' when the refrigeration or heating unit of a 'vehicle' transporting covered property has a sudden or accidental breakdown or malfunction." (*See* Doc. 1-6 at PageID 149-150, PageID 224.)  Neither of those circumstances are alleged here.

II.     **Plaintiff Is Not Entitled to Coverage for Loss of Income or Extra Expenses Because It Has Not Alleged a Suspension of Operations.**

In addition to seeking coverage for loss of the beer itself, Plaintiff seeks coverage for loss of income under the Business Income and Extra Expense Endorsement.   Notwithstanding Plaintiff's failure to allege the presence of "direct physical loss or damage" to property that was "resulting from" any "Risks of Direct Physical Loss"—which dooms Plaintiff's claim for Business Income, Extra Expense, Accounts Receivable, and Inventory coverage—Plaintiff's claim for Business Income and Extra Expense coverage fails for an additional reason.

Business Income coverage is meant to compensate for "the actual loss of Business Income you sustain *due to the necessary suspension of your 'operations' during the 'period of restoration.'*"  (Doc. 1-6 at PageID 94) (emphasis added). Likewise, Extra Expense coverage is meant to compensate for the "necessary Extra Expense you incur during the 'period of restoration[,]'" and Extra Expense is defined to mean "expense incurred" either "to avoid or minimize the suspension of business and to continue 'operations,'" to "minimize the suspension of business if you cannot continue 'operations,'" or to "repair or replace any property; or to research, replace or restore the lost information on damaged valuable papers and records; to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage[.]"  (*Id.*)

As one federal court recently recognized, "[c]ourts interpreting the term 'necessary suspension' in an insurance policy have overwhelmingly held that the term requires a complete cessation, even if temporary, as opposed to a mere slowing down of business before coverage is triggered."  *Hastings Mut. Ins. Co. v. Mengel Dairy Farms, Inc.*, No. 5:19-cv-1728, 2020 U.S. Dist. LEXIS 9007, at *15-16, 18 (N.D. Ohio May 19, 2020) (collecting cases and rejecting claim for coverage because the plaintiff "has not provided evidence suggesting it entirely stopped its

18

operations"). But here, Plaintiff does not allege that it was required to suspend its business operations at all. Although Plaintiff alleges that *Disney* voluntarily and temporarily closed down due to COVID-19, there is no allegation that Plaintiff itself halted its operations and underwent a period of restoration. All allegations point to the contrary, indicating that Plaintiff was still able to purchase the beer from its supplier, and that Plaintiff would have been able to sell that beer for profit to anyone—including Disney—had there been a willing buyer.[5]

Because the Business Income and Extra Expense Endorsements provide coverage for losses incurred due to the suspension of business, and because Plaintiff does not allege that its business was ever suspended, Plaintiff is not entitled to damages for loss of income under either the Business Income or Extra Expense coverage.

III.     **Plaintiff Is Not Entitled to Accounts Receivable Coverage Because It Has Not Alleged Any Damage to Its Records of Accounts Receivable.**

Next, Plaintiff's attempt to recover for "Accounts Receivables" fails for the additional reason that this coverage is designed to protect against damage to the accounting records themselves, rather than to the products underlying those records. (Doc. 1-6 at PageID 114 (conditioning coverage on claims "***which result from direct physical loss of or damage to your records of accounts receivable***").) Here, Plaintiff has not alleged that its "records of accounts receivable" have suffered from any damage.

IV.     **The Inventory Endorsement Does Not Provide an Independent Basis for Coverage.**

Finally, Plaintiff's reliance on the Inventory Endorsement is misplaced. That Endorsement

---

[5] Plaintiff in good faith cannot amend its Complaint to include such an allegation, because it at all times held itself out to the public as open and conducting business operations by distributing wine to local retailers for their customers to purchase or, in their words, "shop for your shelter in place." https://www.facebook.comharvestmoondist/; *See also* http://www.harvestmoondist.com/content/where-purchase-our-wines

does not provide a separate basis for coverage.  Instead, it simply increases the coverage limits when coverage otherwise exists, stating that "The Limit of Insurance for Business Personal Property (BPP) will automatically increase by the Limit of Insurance shown in the Declarations for INVENTORY for temporary variations in inventory."  (Inventory Endorsement, ECF No. 1-6, PageID 68.)  Because, as explained above, Plaintiff has not pleaded facts implicating coverage, the Inventory Endorsement's increase of the Policy's limits has no bearing here.

## V.    Even if Plaintiff Had Suffered Direct Physical Loss or Damage Caused by a Covered Cause of Loss, the Policy's Exclusions Would Bar Recovery.

Even if Plaintiff could meet its initial burden of proving that its claims are within the Policy's scope of coverage, the Policy's exclusions would still preclude Plaintiff from recovering in this case.  *See Fla. Farm Bureau Gen. Ins. Co. v. Ins. Co. of N. Am.*, 763 So. 2d 429, 432 (Fla. 5th DCA 2000) ("[T]he applicability of policy exclusions contained in a policy . . . may be raised by a motion to dismiss when the allegations of the complaint clearly show that the exclusions do apply.").

### A.    The "Delay, Loss of Use or Loss of Market" and "Other Consequential Losses" Exclusions Bar Coverage Under the Policy.

For starters, the Policy's Exclusions make clear that SOIC "will not pay for loss or damage caused by or resulting from . . . Delay, loss of use or loss of market," or from "Any other consequential loss."  (Doc. 1-6 at PageID 83, 85.)  Despite that clear Exclusion, Plaintiff's Complaint expressly alleges that "Plaintiff's *loss of use* of the insured property and insured property's inability to function as contemplated and intended by Plaintiff and Defendant is a direct physical loss." (Doc. 1-2 at ¶ 15.)

As Florida courts have recognized when interpreting policies that "specifically exclude[] loss or damage caused by or resulting from consequential loss, delay, loss of use, or loss of

market," this means that "to the extent any loss claimed to be a loss of business income . . . was not lost as a direct result of [the covered cause of loss] but rather as a consequence of any other reason, then such loss is excluded from coverage and there can be no recovery . . . for such loss." *Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.*, 958 F. Supp. 594, 604 (S.D. Fla. 1997); *see also, e.g.*, *N.H. Ins. Co. v. Hill*, 516 F. App'x 803, 805-806 (11th Cir. 2013) (interpreting Florida law and enforcing similar clause); *Batram, LLC v. Landmark Am. Ins. Co.*, 864 F. Supp. 2d 1229 (N.D. Fla. 2012) (same).

Other courts have done the same. *See Borton*, 2000 WL 60028, at *6-7 ("It is undisputed here that the 1,089 bins of unsold Fuji apples were undamaged and marketable in their current condition. Borton's inability to sell them was not because of something inherent in the apples themselves, but rather (at least in part) because supply exceeded demand in the domestic market. To the extent Borton alleges its loss was the result of conditions in the domestic apple market, the loss is excluded by the 'loss of market' exclusion.").

And so should this Court. Any damages suffered by Plaintiff were not the "direct result" of any Covered Cause of Loss. *Dictiomatic*, 598 F. Supp. at 604. Instead, Disney chose to voluntarily close its parks in light of the COVID-19 pandemic, and Disney chose not to accept shipment of Plaintiff's goods. Plaintiff's "inability to sell" its beer had nothing to do with physical damage to that beer, and was "not because of something inherent in the [beer itself],"[6] but was instead because there was no longer a "demand" for that beer. *Borton*, 2000 WL 60028, at *6-7. Coverage is therefore barred "by the 'loss of market exclusion.'" *See id.*

---

[6] Even if the spoilage was "because of something inherent" in the beer itself, the Policy's exclusion for "decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself" would still bar coverage. (Doc. 1-6 at PageID 83.)

**B.      The "Acts or Decisions" and "Ordinance or Law" Exclusions Bar Coverage Under the Policy.**

In addition, although Plaintiff does not expressly allege that the spoilage of beer was caused by the Governor's Executive Orders, any such argument would be foreclosed by the Policy's Exclusions providing that "[w]e will not pay for loss or damage caused by or resulting from" any "[a]cts or decisions, including the failure to act or decide, of any person, group, organization, or governmental body . . ." or from "[t]he enforcement of any ordinance or law (1) Regulating the . . . use or repair of any property . . ."  (Doc. 1-6 at PageID 82, 84.)

Likewise, the acts or decisions exclusion also bars coverage because it was Disney's act or decision to voluntarily close its parks, rather than any Covered Cause of Loss, that allegedly caused Plaintiff to suffer damages.  *See Scottsdale Ins. Co. v. Sally Grp., LLC*, No. 4:11-cv-01184, 2012 WL 1144577, at *33 (S.D. Tex. Apr. 3, 2012) ("Rio 24's landlord ordered the destruction of Rio 24's entire inventory, and Rio 24 complied. Therefore, the loss was caused by the act or decision of a person or organization—namely, Rio 24's landlord. For these reasons, Rio 24 cannot recover under the Business Income (and Extra Expense) Coverage Form.").

**C.      Special Exclusions Bar Coverage Under the Policy.**

Finally, several of the "Special Exclusions" that apply to the Business Income and Extra Expense Endorsement also bar coverage.  Under that Form, SOIC "will not pay for" the following:

- "Any loss caused by or resulting from: (a) Damage or destruction of "finished stock;" or (b) The time required to reproduce "finished stock.";

- "Any increase of loss caused by or resulting from: . . . (b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of 'operations,' we will cover such loss that affects your Business Income during the 'period of restoration'"; or

- "Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the 'period of restoration.'"

Here, Plaintiff appears to seek recovery for "damage" to "finished stock." (Doc. 1-2 at PageID 18, ¶ 36 (indicating that the covered property was "Stock").) And any losses appear to be resulting from the "suspension, lapse, or cancellation" of Plaintiff's "contract" with Disney. (Doc. 1-2 at PageID 20, ¶ 40.) Because these losses are excluded from coverage, the Complaint should be dismissed on this ground as well.

## CONCLUSION

For the reasons stated above, SOIC respectfully requests that this Court grant its Motion to Dismiss, dismiss Plaintiff's claims with prejudice, and enter judgment in SOIC's favor.

Dated: June 18, 2020.                                By:

                                                          Mark D. Tinker, Esq., B.C.S.
                                                          Florida Bar No. 0585165
                                                          Lori McAllister, Esq.
                                                          MI Bar No.: 39501 (*pro hac vice forthcoming*)
                                                          *Trial Counsel for Southern Owners*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this June 18, 2020, the foregoing was filed with the Clerk using the CM/ECF system, which will automatically serve a copy on the following registered users: **Imran Malik, Esquire**, *Counsel for Harvest Moon*, Malik Law P.A., 1061 Maitland Center Commons Blvd., Maitland, FL 32751, (407) 500 1000, pleadings@imaliklaw.com.

Lori McAllister, Esq.
MI Bar No.: 39501
*pro hac vice* application forthcoming
Dykema Gossett PLLC
Capitol View, 201 Townsend Street
Suite 900
Lansing, MI 48933
Tel.: (517) 374-9100
E-mail: lmcallister@dykema.com

COLE, SCOTT & KISSANE, P.A.
4301 West Boy Scout Blvd., Suite 400
Tampa, FL 33607
Tel.: (813) 509-2613
Fax: (813) 286-2900
Primary e-mail: mark.tinker@csklegal.com
Secondary: mason.bradford@csklegal.com

By:

     Mark D. Tinker, Esq., B.C.S.
     Florida Bar No.: 0585165

*Trial Counsel for Southern-Owners Ins. Co.*

23